AMY JANE LONGO Cal. Bar No. 198304
Email:  longoa@sec.gov
DAVID M. ROSEN Cal. Bar No.  150880
Email:  rosend@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Michele Wein Layne, Regional Director
Alka N. Patel, Associate Regional Director
John W. Berry, Regional Trial Counsel
444 South Flower Street, Suite 900
Los Angeles, California 90071
Telephone:   (323) 965-3998
Facsimile:    (213) 443-1904

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br><br> vs. <br><br> PLCMGMT LLC, dba PROMETHEUS LAW, JAMES A. CATIPAY, and DAVID A. ALDRICH, <br><br> Defendants. | Case No. <br><br> **COMPLAINT** |

Plaintiff Securities and Exchange Commission (the "SEC") alleges as follows:

## JURISDICTION AND VENUE

1.       This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d)(1) and 77v(a); Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e), and 78aa.

2.     Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce or of the mails, in connection with the transactions, acts, practices and courses of business alleged in this Complaint.

3.     Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a), because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district.  In addition, venue is proper in this district because two of the defendants reside in this district.

## SUMMARY

4.     This action arises from an offering fraud operated by defendants James Catipay and David Aldrich, and their company, defendant PLCMGMT LLC (dba Prometheus Law) ("Prometheus").  Since 2013, the defendants have raised at least $11.7 million from more than 250 investors located nationwide—most of them retirees—for their highly risky "legal marketing" program.  Defendants claimed they would use the money to fund marketing efforts designed to locate potential plaintiffs for mass tort litigation regarding prescription drugs or medical devices.  They would then refer the potential plaintiffs they found to a contingency-fee attorney, and then use proceeds of lawsuit settlements to pay the investors' returns.  The defendants partnered with an attorney who would handle the lawsuits, if they were ever filed. Each investor's investment was to be associated with a specific potential plaintiff.

5.     In soliciting investors and offering and selling these investments, the defendants misled the investors and misused investor funds.  For one, the defendants guaranteed returns of between 100% to 300%, asserting there was "minimal" or "no" risk to the investments, because they claimed the investors had "forward contracts" that would be paid off after specific periods, and that the mass tort cases had settlement funds just waiting in escrow to be claimed.  In fact, the investments were highly speculative and risky, given that only certain of the potential plaintiffs located by the defendants through their marketing efforts would qualify as actual plaintiffs.

And even if a case was actually filed on behalf of a plaintiff located by the defendants, it was far from certain when the case would be brought or whether it would succeed.

6.      The defendants also promised redemption of 100% of investors' principal on demand, and that investors' principal was secured by a lien under the Uniform Commercial Code ("UCC") on funds residing in Prometheus' account.  Both statements were false.

7.      The defendants did not use the majority of the investor funds raised for their legal marketing program, or set it aside so it could be available to secure or redeem existing investors' funds.  Instead, Catipay and Aldrich spent millions of dollars on personal items, including a million-dollar loft in downtown Los Angeles and paying Aldrich's personal income taxes.  So when the first approximately $120,000 of investor returns came due, the defendants used money raised from new investors to pay the existing investors—payments that both Catipay and Aldrich admitted were, in fact, Ponzi payments.

8.      Moreover, defendants did not disclose the risk underlying their entire business model, given that it called for fee-splitting by the contingency fee attorney and Catipay (who are lawyers), with defendant Aldrich and the investors (who are not lawyers), a practice that is widely prohibited, and therefore potentially unenforceable.

9.      In February 2015, after raising approximately $8.54 million, Aldrich and Catipay ended their business relationship, and Catipay took sole ownership of Prometheus.  After the breakup, Catipay continued soliciting investors, but stopped marketing for any new potential plaintiffs.  As a result, the number of investors assigned to potential plaintiffs increased, while the pool of unassigned potential plaintiffs shrunk.  Yet, Catipay continued to tell investors that they would receive guaranteed returns and could redeem their investments at any time.  He never disclosed the dilutive effect of selling off the decreasing inventory of potential plaintiffs.  Each assignment of a potential plaintiff from the now-finite pool increased

the investors' risk that a substitute potential plaintiff would not be available if the previously-assigned plaintiff fell through.  Catipay raised $3.18 million of investor proceeds during this time.

10.    Defendants currently owe investors at least $4.7 million in investor returns that have come due, but cannot be paid.  As additional investments mature, and excluding penalties for late payments, defendants will owe investors a total of $31.5 million by February 2018, when the remaining outstanding investor contracts are due.

11.    To date, however, lawsuits have only been filed on behalf of roughly 700 of the approximately 2,300 potential plaintiffs whom Prometheus and its co-counsel jointly represent, and Prometheus has received less than $10,000 in total attorney's fees from the legal settlements.

12.    As a result, the defendants have violated and are continuing to violate the antifraud provisions of Section 17(a) of the Securities Act, 15 U.S.C. § 77q, and Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder. Also, because the defendants never registered the offer or sale of the Prometheus investments, they have violated the registration provisions of Section 5 of the Securities Act, 15 U.S.C. § 77f.  By selling these securities through a network of sales agents paid on commission, and by receiving commissions from Prometheus, Catipay has acted as an unregistered broker-dealer in violation of Section 15(a) of the Exchange Act, 15 U.S.C. § 78(o).

13.    The SEC seeks a preliminary injunction against defendants Prometheus and Catipay prohibiting future violations.  The SEC seeks against all defendants an order requiring an accounting, imposing an asset freeze, and requiring preservation of documents; against defendant Prometheus only, the SEC also seeks an order appointing a permanent receiver. In addition, the SEC seeks permanent injunctions against all of the defendants and disgorgement of their ill-gotten gains, prejudgment interest, and civil penalties.

4

## THE DEFENDANTS

14.     Defendant **PLCMGMT LLC dba PROMETHEUS LAW** ("Prometheus") is a California corporation, incorporated on December 7, 2013, and headquartered in Los Angeles.  Prometheus was founded by Defendant Catipay, its chief executive officer, managing attorney, and a managing member, to finance the recruitment of potential mass tort plaintiffs, through legal marketing.  Until approximately February 15, 2015, Catipay owned 55% of Prometheus, and Defendant Aldrich was also a 45% owner, as well as the president, chief marketing officer, and a managing member.  Both controlled Prometheus' bank accounts during their association.  After February 15, 2015, Defendant Catipay became Prometheus's sole member and owner.

15.     Defendant **JAMES A. CATIPAY** ("Catipay"), age 39, resides in Los Angeles, California.  Catipay founded Prometheus and currently is its sole owner and managing member.  Catipay is licensed to practice law in Michigan, and operates the Law Offices of James Catipay PLLC, a Michigan professional corporation where he represents clients in federal income tax disputes (the "Catipay Law Firm").  Catipay does not hold any securities licenses and is not registered with the SEC in any capacity.

16.     Defendant **DAVID A. ALDRICH** ("Aldrich"), age 43, resides in Bothell, Washington.  Until approximately February 15, 2015, Aldrich was Prometheus's president and chief marketing officer.  He is no longer associated with Prometheus.  Aldrich does not hold any securities licenses and is not registered with the SEC in any capacity.

## OTHER RELEVANT ENTITIES

17.     **PLCMGMT LLC** (Washington) ("PLC WA") is a now-defunct Washington corporation incorporated on August 23, 2013.  Aldrich founded PLC WA as the predecessor to Prometheus, and was its sole owner and member, as well as the person with sole control over its bank accounts.

18.   **ATTORNEY A** ("Attorney A") resides in Seattle, Washington.  In late 2013, Attorney A contracted first with Prometheus, and then with Catipay, to jointly represent potential plaintiffs in mass tort cases that Prometheus referred to him, in exchange for which Prometheus would receive a share of any settlement or adjudication of the potential plaintiff's claim, if such a claim was filed.  Under the standard retainer agreement, Attorney A's firm would generally receive a 33% contingency fee, of which Attorney A agreed to provide 33 1/3% (or 11% of the total fee) to Prometheus.

### THE FRAUDULENT SCHEME

19.    Since 2013, defendants have raised at least $11.7 million from more than 250 U.S. investors through 1,331 unregistered securities transactions.  After taking over the business from Aldrich in March 2015, Catipay continued soliciting investors through approximately February 2016.

**A.   Background of Prometheus**

20.    Before meeting Catipay, Aldrich, who is not an attorney, had formed PLC WA and was soliciting investments for legal marketing to locate potential mass tort plaintiffs.  Aldrich began soliciting those investments in or about mid-2013, and by October 2013, he had raised approximately $32,000 from five investors.

21.    Aldrich interviewed approximately 100 attorneys with whom he proposed sharing fees in exchange for referrals of potential plaintiffs he could locate and screen through his legal marketing efforts.  However, all of the attorneys he interviewed declined because of the ethical prohibition against fee-sharing with non-lawyers.

22.    Aldrich was considering closing down PLC WA operations when, in October 2013, he met Catipay, a tax attorney.  Catipay agreed to join with Aldrich in pursuit of funding for legal marketing to potential mass tort plaintiffs, and they formed Prometheus.  Catipay revamped the Prometheus website that they used to solicit investors.

23.    In or about November 2013, Attorney A agreed to partner with

6

Prometheus.  On or about November 6, 2013, Attorney A's law firm, the Catipay Law Firm, and Prometheus executed a trilateral "joint representation agreement," for the "joint representation of potential clients in mass tort litigation."

24.    Pursuant to the joint representation agreement, the Catipay Law Firm and Prometheus would be responsible for managing the marketing to and the evaluation of potential mass tort plaintiffs to refer to Attorney A, while Attorney A's law firm would be responsible for obtaining retainer agreements from qualified plaintiffs, and litigating their cases.  The joint representation agreement provided that Attorney A's firm would make available upon request information concerning the status of the referrals.

25.    Upon the successful resolution of any case brought on behalf of a plaintiff referred under the agreement, the Catipay Law Firm and Prometheus were entitled to 33 1/3% of the net attorneys' fees awarded.

26.    At Prometheus, Catipay assumed responsibility for raising funds, while Aldrich assumed responsibility for marketing, screening and qualifying potential plaintiffs.

27.    On or about July 31, 2014, Attorney A's law firm and Catipay executed a bilateral joint representation agreement containing similar provisions to the November 6, 2013 joint representation agreement.

28.    While Catipay and Aldrich were operating the business together, they raised at least $8.54 million from investors, in approximately 1,018 investments.

29.    Due to a dispute between them, on or about February 15, 2015, Aldrich and Catipay decided to part ways, and Catipay took sole ownership of Prometheus.

30.    In early March 2015, Catipay filed suit against Aldrich in state court for, among other claims, breach of fiduciary duty and breach of contract, alleging that Aldrich had converted $3.425 million of Prometheus' assets for personal use.

31.    Catipay continued soliciting investors to invest in Prometheus.  However, he ceased all legal marketing to find new potential plaintiffs, and instead relied on the

1  inventory of potential plaintiffs to generate, allegedly, returns for his new investors.

2       32.    After Catipay took over the business, he raised at least another $3.18

3  million from investors, in approximately 313 additional investments.

4       33.    Only after providing testimony to the SEC in February 2016 did Catipay

5  stop soliciting investors.  In an email to Prometheus' investors and its sales agents on

6  or about February 15, 2016, Catipay attempted to lull investors and discourage

7  redemption requests.  First, he claimed that Prometheus was no longer accepting new

8  funds because it had reached a "pre-established excess case ratio," referring to the ratio

9  of potential plaintiffs to investors.  Second, he touted his "sincere and genuine

10  commitment to all of our clients that everyone's investment is safe and secure."

11       34.    Nowhere in this communication did Catipay disclose Prometheus'

12  deepening inability to repay investors as their investments mature.

13       35.    From 2013 to February 2016, Prometheus raised at least $11.7 million

14  from more than 250 U.S. investors in 1,331 unregistered securities transactions.

15  **B.    The Prometheus Investments**

16       36.    The defendants called the investments they offered and sold "prepaid

17  forward contracts."  These investments had a fixed principal amount, and set the date

18  when that initial investment and a guaranteed return would be paid back to the investor.

19       37.    Initially, the defendants offered and sold investments in the form of three

20  different types of contracts:  (1) one requiring a $5,000 investment, due to paid back in

21  12 months and with a  guaranteed 100% return; (2) another requiring a $7,500

22  investment, due to paid back in 22 months and with a guaranteed 200% return; or and

23  (3) a third requiring a $10,000 investment, due to be paid back in 30 months and with a

24  guaranteed 300% return.

25       38.    Subsequently, the defendants offered and sold the investments in $10,000

26  increments, primarily for 24 months and fixed returns of either 100% or 125%, though

27  some investments contained longer terms and higher fixed returns.

28       39.    Additionally, the defendants represented that if they were unable to repay

investors in the contemplated time period, they would extend the contract and pay late fees in varying amounts and terms.  Late fees ranged between a flat $500; a fee of 2.09% per month up to an additional $2,500; and a fee of 4.16% per month for 12 months.

40.   The defendants offered and sold these prepaid forward contracts through general solicitations, in varying lengths and increments, primarily funded from investors' retirement accounts.

41.   Defendants did not limit their offering of Prometheus investments to accredited investors.  Indeed, the minimum $10,000 investment amount is indicative of an offering to unaccredited investors.

42.   Defendants offered and sold the Prometheus investments through an offering document given to investors.  The offering document was initially referred to as a "due diligence packet."  In May 2014, defendants renamed the offering document an "information packet."  In August 2014, January 2015, March 2015 and June 2015, Prometheus updated the information packet

43.   Among other items, the information packets contained:  (1) a letter signed by Aldrich as president or chief marketing officer for Prometheus (until March 2015); (2) a letter signed by Catipay as the managing attorney for Prometheus; (3) biographies of Aldrich and Catipay; (4) a Frequently Asked Questions section; (5) investor testimonials; (6) a step-by-step sales process; and (7) contractual documents.

44.   The Prometheus investments were sold through Prometheus' website, by phone and email, and were advertised in *USA Today*.  Prometheus' sales force consisted of approximately 60 independent sales agents—many of them insurance agents—who were not registered to sell securities.  The sales agents utilized lead lists and made cold calls to solicit investors, and were typically paid a 10% commission.

**C.   The Defendants' Misrepresentations and Omissions**

45.   Defendants made a series of false or misleading statements and omissions in offering and selling investments in Prometheus, both in their written materials and in

their oral representations to investors.

**1.   The defendants' misleading depiction of the safety and security of the investment**

46.     Defendants' offering materials and oral representations mischaracterized the safety and security of investments in Prometheus in several respects, including as to: (1) the existence or imminence of a global settlement fund pertaining to the mass tort claims at issue; (2) guaranteed returns with minimal risk; (3) the availability of principal redemption upon request; and (4) the presence of a UCC lien on an account securing the investment.

**a.   *Claims about existing or imminent settlement funds***

47.     With respect to the potential plaintiffs sought, defendants' initial due diligence packet assured investors that:

> Prometheus focuses on individual tort medical liability cases
> where the defendants have lost in court and settlement funds
> have been or are about to be placed in escrow in order to pay
> out claims as they arise…Prometheus only markets to and
> qualifies plaintiffs in pre-settled (or about to be settled) cases
> where funds have been placed in escrow and are awaiting
> individual claims, which are continuously being filed.

48.     Similarly, a marketing flyer disseminated to investors falsely stated that Prometheus "seeks out plaintiffs for individual suits often based, in part, on other already adjudicated settlements that were lost by the defendants…These settlement funds are substantial and require only the proper acquisition, evaluation and intake of potentially waiting plaintiffs (claimants) to come forward and present their claims." In addition, Prometheus' website indicated "[t]he majority of cases we pursue have already been settled.  Funds are placed in escrow to be disbursed as qualified plaintiffs come forward."

49.     These statements were false and misleading when made.  At the time

defendants made these statements, there were no funded mass tort settlements pertaining to the pharmaceutical drugs or devices for which Prometheus had potential plaintiffs.

50.     Also, over time, over 80% of Prometheus' potential cases concerned a single pharmaceutical drug.  However, there was (and is) no global settlement fund for cases regarding that drug, and thus no fund to pay claims asserted by any of the potential plaintiffs located by the defendants.

51.     These misstatements were material, because they directly affected the safety and security of the investment, and Prometheus' ability to repay investors in a timely manner.

### b.     *Guaranteed return and claims of low or no risk*

52.     Defendants promised investors that their Prometheus investments would pay fixed returns of between 100% to 300%, while falsely assuring investors that the offering was low-risk.

53.     For example, one advertisement run by defendants in a national newspaper *USA Today* promised "up to 125-150% returns at minimal risk," claiming that Prometheus' investments "have remarkable security separate from real estate, equity markets, and startup business risks."

54.     Defendants' information packet similarly presented the guaranteed nature of the repayment, telling investors that, "You purchase what is called a 'Prepaid Forward Contract' which provides for predetermined return on your money within a predetermined future (forward) time frame," and that, "we offer prepaid forward contracts, which set out the exact amount of the return to which you are entitled."

55.     Along with the fixed return, defendants touted that the offering was low-risk, for example by describing in the information packet that, "this contract involves no risk as the client receives a written agreement holding an interest in one of our leads that is verified and partner attorney retained in exchange for their capital."

56.     Similarly, a marketing brochure disseminated by defendants assured

investors that, "A typical investment with these type[s] of returns would raise flags about it being 'too good to be true.' However, Litigation Funding is not an investment. These are legal agreements, with payouts to each Funder specifically defined."

57.     These statements were false and misleading when made, because of the known uncertainties as to whether any given potential plaintiff would file a claim, whether and to what extent the claim would succeed, and the timetable for any litigation recovery.

58.     With regard to investor returns coming due in December 2014, Aldrich wrote in an October 2014 email to Catipay that, "as settlements have been pushed out our ability to pay returns from those settlements will have to be pushed out." Thus, by October 2014, if not before, the defendants were aware that Prometheus' potential plaintiffs' claims were not generating recoveries sufficient to repay the promised investor returns in a timely manner.

59.     In or about November or December 2014, Catipay and Aldrich spoke with a medical claims underwriting attorney regarding the valuation of the particular medical tort claim then comprising nearly 90% of Prometheus' inventory, and were told, "I can't believe you guys are still trying to generate that junk. No one is getting [those] cases anymore."

60.     Then, in a March 23, 2015 email, Attorney A, warning Catipay and Aldrich to settle their litigation against each other immediately lest investors "catch wind" of it and seek their money back, wrote to both principals about the shortcomings of Prometheus' inventory of potential plaintiffs:

> You also understand that not every case that is retained
> makes it to settlement, especially with a population of
> clients who have been diagnosed with serious mental
> illness. Some people think they took [the drug] and did not.
> Some took the generic form of the drug and therefore do not
> have a claim. Some send in photos that show no injury

whatsoever.  Some drop off the face of the earth and don't
respond to multiple calls and letters.  Then there are the
risks of a bad ruling from the bench…

61.    Yet Catipay continued soliciting investors for nearly another full year, continuing to promise low-risk, fixed returns.  No longer seeking out new potential plaintiffs, Catipay assigned new investors potential plaintiffs from Prometheus' existing inventory.  During this period, Catipay did not disclose this change in the company's business model, nor the deepening risk arising from his ongoing dilution of Prometheus' inventory of potential plaintiffs.

62.    These misstatements were material, because they directly affected the safety and security of the investment and Prometheus' ability to repay investors in a timely manner.

###    c.    *Claims about the ability to redeem*

63.    Defendants promised that investors could redeem their principal at any time.  For example, Prometheus' initial offering document promised that:

- "[w]e are the only firm that also offers a 100% reimbursement of your principal from day one to the day of your settlement";
- "we offer the option to refund or redeem your principal anytime before settlement…" and
- "[f]rom the day you begin, your funds are guaranteed.  If you want the purchased cost of your Funding Contract(s) returned before the termination date noted, just inform us in writing so you can exercise your refund or redemption options per your contract."
- "[o]ur customer's capital is never at risk because our customer has the lead in exchange for their capital at the time of purchase."

64.    This promise reappeared in the defendants' information packet used during 2014, in which they promised:  "[w]e offer the option to refund or redeem your principal anytime before settlement" and that "our customers' capital is never at risk."

65.     Even after Catipay sued Aldrich for allegedly converting $3.425 million of the business's assets, Prometheus continued to promise investors, including in its June 2015 information packet, that redemption was available, requiring investors to sign an agreement stating that:  "PLC has informed me that following the expiration of the 3-day rescission period, I may still request a full refund of the funding amount at any time prior to Contract fulfillment.  However I understand that my right to rescission expires after 3 days and upon request for refund at anytime I am not entitled to any portion of a return in addition to the principal amount."

66.     These statements were false and misleading when made, because at no time was Prometheus in a position to fund 100% redemption for investors upon request.

67.     These misstatements were material, because they directly affected the safety and security of investors' principal.

### d.     *Claims about the presence of lien for security*

68.     The defendants represented that investors' funds were secured under the Uniform Commercial Code ("UCC") by a lien against funds in a corporate bank account.

69.     For example, Prometheus' information packet promised that "[w]e take the financial risk by securing your funds 100%....  [The] contracts issued to funders are secured by a lien against their client settlement account at their bank."

70.     Bolstering this promise, the defendants provided with the offering materials a Form UCC-1financing statement for investors to complete as part of their subscription, and had investors sign a "collateral agreement" reflecting their receipt of "a collateral interest in the following property of Firm…Prometheus Law Client Legal Trust Settlement Account," with the account number for one of Prometheus's bank accounts.

71.     The collateral agreement executed by the investor and Catipay stated: "Prometheus Law ('Firm'), for valuable consideration, receipt of which is

acknowledged, grants to [the Funder] a collateral interest [in Prometheus's] bank account…."

72.     These statements were misleading when made.  First, investors were not told that they needed to file the UCC form themselves in order for it to provide any security, nor were they provided instructions on how to do so.

73.     Second, investors were not told that the bank account subject to the collateral agreement would only have "client settlement" funds in it if and when Prometheus received any attorney's fees from settlements, nor were they told that the account was continually being depleted to pay Prometheus' operating expenses.

74.     These misstatements were material, because they pertained to the security of investors' principal while invested with Prometheus.

**2.     The defendants' misuse of investor funds**

75.     Of the $11.7 million raised from investors, Prometheus spent only $4.3 million, or 37%, on legal marketing expenses.

76.     Aldrich took for himself approximately $3.7 million of investor proceeds, including:  (1) a $500,000 "draw" in June 2014; (2) $1.032 million to pay his personal federal and state income taxes; (3) $1.072 million to purchase a residential condominium recorded in the name of PLC WA, including "high end" furnishings and linens; (4) $208,551 to pay his own legal bills; and (5) $926,897 in miscellaneous other withdrawals.

77.     None of these uses of investor funds were authorized or reflected in Prometheus' offering materials.  Rather, Prometheus gave the misleading impression that it was using the money raised from investors to fund its business operations. Specifically, in the January 2015 Information Packet, Prometheus indicated " . . . we look forward to fulfilling our primary goal which is to market, screen, and qualify . . . ." potential plaintiffs.

78.     A "Funding Process" flow chart provided by defendants' sales agents to investors depicted, as steps in the funding process:  "Funder Purchases Pre-paid

Forward Contract from Legal Marketing Firm ➔ Funding Used To Identify, Vet and Qualify Plaintiff (Claimant").

79.     Similarly, without disclosure, Catipay took approximately $1.87 million as of early 2016, or roughly 16% of what Prometheus raised from investors. Following the settlement of his litigation with Aldrich, Catipay further received the deed to the downtown Los Angeles condominium previously held by PLC WA that was purchased with investor funds.

80.     Nevertheless, Prometheus continued to give the misleading impression that it was using the money raised from investors to fund its business operations. Prometheus did so by repeating this statement in its information packets used in 2015.

81.     Prometheus also paid approximately $1.2 million in commissions to its independent sales agents.

82.     Catipay's lawsuit against Aldrich in March 2015 alleged that Aldrich had misused investor monies by failing to use proceeds for legal marketing.

83.     That same month, in the March 23, 2015 email in which Attorney A advised Catipay and Aldrich to promptly settle their litigation against each other, he further advised them of the impact of such spending on their ability to repay investors in a timely manner:

> Here is your situation as I see it….You have not put enough money into case acquisition and if you don't fix this you aren't going to have anywhere enough money to pay people back....
>
> If you had put the right amount of money into case acquisition, you would likely have 6000 cases right now instead of 3000.  With 6000, with the risks of litigation and people not qualifying, you would be in a much better position when it comes to paying people.

84.     By using investor monies for purposes other than legal marketing to

16

locate potential plaintiffs, the defendants hindered Prometheus' ability to generate sufficient potential plaintiffs to qualify for, and prevail in, the mass tort cases on which investors' timely repayment depended.

85.     The failure to disclose this misuse of investors' funds was material, because it precluded the defendants from being able to repay investors on time as their contracts mature.

**3.     The defendants' mischaracterization of the attorney fee-sharing**

86.     The defendants represented to investors that Prometheus' offering did not constitute a prohibited attorney fee-sharing arrangement.

87.     For example, the defendants' information packet provided the following in the Frequently Asked Questions section:

> Q: I thought law firms and attorneys could not split legal fees
> with unlicensed persons. Isn't this true?
> A: Usury laws restrict the amount of interest which can be
> charged on funds which are loaned. A loan calls for interest
> at a stated rate, which accrues until repayment is made. In
> the case of a prepaid forward contract, you are contracting
> for an agreed upon return regardless of the time frame for
> repayment. You are not loaning Prometheus money. You are
> purchasing a Prepaid Forward Contract.

88.     Furthermore, Prometheus represented in the due diligence packet and the information packet, dated May 2014, that ". . . there is no "splitting" of legal fees" between Prometheus and any attorneys.

89.     These statements were false and misleading when made, because defendants knew, or were reckless in not knowing, that the agreements between defendants and Attorney A, and between themselves and the investors, may be construed as prohibited fee-sharing agreements, and therefore potentially voidable on public policy grounds.

90.     As he conveyed to Catipay when they first met in 2013, Aldrich had discussed the proposed business model with approximately 100 attorneys before Catipay, and no other attorney would enter into this type of business arrangement with him, because of the ethical prohibition against fee-sharing.

91.     In or about April 2014, Aldrich and Catipay received written legal advice from Prometheus' and Catipay's attorney that the investment they were offering constituted illegal fee-sharing: "The bottom line is that [Aldrich] is receiving a percentage of the legal fees that [Catipay], an attorney are sharing them with him . . . [and] the investor is being paid a portion of the contingency fee.  Regardless of what you call the arrangement, that is the end result.  This concerns me."

92.     The defendants disregarded this advice and continued soliciting investors while representing that their legal marketing program did not involve prohibited fee-sharing.

**D**.     **The Defendants' Fraudulent Scheme**

93.     The defendants gave investors the false impression that the Prometheus investments were safe, risk-free investments that would be paid back in a set time with guaranteed returns.

94.     However, as alleged above, the investments were high risk, speculative investments that could never pan out.

95.     The risk was exacerbated by the fact that the defendants were taking the majority of investor proceeds for themselves rather than using it to locate more potential plaintiffs and by the fact that the fee-sharing arrangement that underlies each investment could render the investments void and unenforceable.  As alleged above, Aldrich took for himself approximately $3.7 million of investor proceeds, and Catipay took approximately $1.87 million.

96.     In fact, as of early 2016, lawsuits have been filed on behalf of only 700 of the approximately 2,300 potential plaintiffs whom Prometheus and its co-counsel continue to jointly represent.

97.     As of early 2016, Prometheus has received less than $10,000 in attorneys' fees from legal settlements in cases brought by the plaintiffs that defendants located.

98.     The defendants have not generated sufficient returns from these cases to be able to either pay the guaranteed returns they promised (nor late fees) or to satisfy redemption requests.

99.     Because the cases brought on behalf of the plaintiffs whom defendants located resulted in so little revenue to Prometheus, the defendants made Ponzi-like payments to certain investors to pay their returns and redemptions.

100.    Specifically, in December 2014, returns for the first prepaid forward contracts were due.  Since Prometheus had no operating revenues to pay these obligations, Catipay and Aldrich directed $120,000 in payments to investors using new investor monies.

101.     Both Catipay and Aldrich have since each admitted under oath that these were Ponzi payments.

102.    Apart from these Ponzi-like payments, and four other payments to investors totaling $16,000 in December 2014, none of Prometheus' investors have been paid their contractual returns, nor late fees.

103.    This problem will only get worse as time goes on.  By October 2016, as additional investments mature, and excluding penalties for late payments, defendants will owe Prometheus investors at least $10.4 million.

104.    By April 10, 2017, as additional investments mature, and excluding penalties for late payments, the defendants will owe Prometheus investors at least $25.6 million.

105.    By February 2018, as the remaining investments mature, and excluding penalties for late payments, the defendants will owe Prometheus investors at least $31.5 million.

**E.**     **The Defendants' Scienter and Negligence**

106.     Catipay and Aldrich acted with intent or deliberate recklessness, in offering and selling investments in Prometheus.

107.     Between November 2013 and February 2015, Catipay and Aldrich were the senior management, owners and principals of Prometheus, and they controlled the company's bank accounts.  After their separation, Catipay functioned in this role.

108.     Catipay and Aldrich each prepared, reviewed and/or approved the due diligence and information packets used to solicit Prometheus' investors.

109.     Catipay and Aldrich personally spoke to prospective investors, and Catipay supervised the network of sales agents soliciting investors.

110.     Catipay and Aldrich knew on a real-time basis how many potential plaintiffs Prometheus jointly represented with Attorney A, and the type of medical device or pharmaceutical relating to each potential plaintiff's possible mass tort claim.

111.     Under their joint representation agreement with Attorney A, Catipay and Aldrich had full access to information about the status of cases brought on behalf of any plaintiffs they referred to Attorney A.

112.     Contrary to their representations to investors, Catipay and Aldrich knew that investment in Prometheus was highly speculative, because the filing, timing and outcome of the potential plaintiffs' mass tort claims was uncertain, and because global settlement funds were neither available nor imminent in the types of litigation for which Prometheus obtained potential plaintiffs.

113.     Catipay and Aldrich further knew, from their control of Prometheus' bank accounts, that funds were unavailable to provide either a secured lien for investors' monies, or 100% redemption upon request, contrary to Prometheus' solicitations.

114.     By sometime in 2014, Catipay and Aldrich knew that Prometheus was already unable to repay initial Prometheus' investors as their contracts came due, and that Prometheus would not be in a position to timely pay existing or new investors

their promised returns as they came due, given how few of the underlying mass tort claims were being filed, let alone litigated or resolved on behalf of Prometheus' potential plaintiffs.

115.   Sometime after February 15, 2015, Catipay knew that at least nine investors had requested but not received redemptions.

116.   In late 2014, Catipay and Aldrich knew, as both later admitted under oath, that they utilized $120,000 of new investor funds to pay returns due to existing investors, in Ponzi-like fashion.

117.   Catipay and Aldrich also knew that the monies Prometheus raised from investors were spent in a manner inconsistent with generating enough potential plaintiffs to be able to repay investors from the attorney's fees obtained in mass tort cases:

> a)  Aldrich knew that he took a $500,000 "draw"; took $1.032 million to pay his personal income taxes; took $208,551 to pay his legal bills; and took $926,897 in other miscellaneous withdrawals;
>
> b)  Catipay and Aldrich knew that they spent $1.072 million to purchase a residential condominium—fully furnished—that was recorded in the name of PLC WA, before being transferred to Catipay individually in October 2015;
>
> c)  Catipay alleged in March 2015, in the lawsuit he filed against Aldrich, that Aldrich had diverted $3.425 million in funds from Prometheus; and,
>
> d)  Catipay knew that he took approximately $1.87 million, or roughly 16% of what Prometheus raised from investors, and that Prometheus had paid $1.2 million in sales agent commissions.

118.   Based on conversations Aldrich had with other attorneys before meeting Catipay (which he relayed to Catipay in October 2013), and based on legal advice Aldrich and Catipay received in April 2014, both principals knew that the fee-sharing agreement underlying Prometheus' offering was prohibited by the ethical rules

1  governing attorneys, and therefore potentially unenforceable as void against public
2  policy.

3      119.   Based on legal advice they received in April 2014 and information
4  received from various investors and their counsel, Catipay and Aldrich further knew
5  that they were offering and selling securities without registration or any exemption
6  therefrom.

7      120.   In June 2014, the California Department of Business Oversight
8  subpoenaed documents from Catipay and Prometheus as part of its investigation into
9  whether Prometheus was offering unregistered securities.

10      121.   In addition, defendants also acted with negligence in offering and selling
11  investments in Prometheus.

12      122.   Because of Catipay's and Aldrich's positions as Prometheus' principals,
13  their scienter and negligence are attributable to Prometheus.

14  **F.    The Defendants' Registration Violations**

15      **1.    The unregistered offer and sale of securities**

16      123.   The offer and sale of Prometheus investments were made without
17  registering those transactions or securities with the SEC.

18      124.   The securities transactions included the offer and/or sale of investment
19  contracts and/or notes.

20      125.   These offers and/ sales were not exempt from the registration of the
21  federal securities laws.

22      126.   The defendants offered and/or sold investments in Prometheus through
23  the newspaper, on their website, and through a network of sales agents who used lead
24  lists and made cold calls.

25      127.   Most of the investments in Prometheus were in increments of $10,000.

26      128.   The defendants did not restrict the offer and sale of Prometheus
27  investments to accredited investors.

28      129.   In soliciting investors, the defendants failed to inquire regarding the

1  investors' financial condition or sophistication.

2      130.   Aldrich and Catipay were both necessary participants and a substantial

3  factor in the offer and sale of Prometheus investment contracts.

4      **2.      Catipay's acting as an unregistered broker-dealer**

5      131.   The defendants solicited investors using a network of approximately 60

6  unregistered sales agents—mainly insurance salespeople—who were paid commissions

7  of approximately 10% per sale.

8      132.   Beginning in November 2013, Catipay supervised Prometheus' sales

9  representatives directly.  After May 2014, Catipay additionally supervised Prometheus'

10  chief funding officer, who also supervised the sales agents.

11      133.   Catipay agreed to accept a 10% commission related the sales of the

12  prepaid forward contracts.

13      134.   Catipay received approximately 16% of the offering proceeds Prometheus

14  raised from investors.

15      135.   Catipay was involved in determining the terms of the offering and

16  regularly spoke with investors personally.

17      136.   Catipay directed the sales agents to cold-call investors.

18      137.   As such, Catipay acted as a broker-dealer, as that term is defined in the

19  federal securities laws.  However, Catipay is not—and has never been—registered with

20  the SEC as a broker-dealer, nor was he associated with any registered broker-dealer.

21                      **<u>FIRST CLAIM FOR RELIEF</u>**

22                  **Unregistered Offer and Sale of Securities**

23          **Violations of Section 5(a) and (c) of the Securities Act**

24                          **(against all Defendants)**

25      138.   The SEC realleges and incorporates by reference paragraphs 1 through

26  131  above.

27      139.   The investments as alleged herein constitute "securities" as defined by the

28  Securities Act and the Exchange Act.

                                    23

140.   The defendants, by engaging in the conduct described above, directly or indirectly, singly and in concert with others, made use of the means or instruments of transportation or communication in interstate commerce, or of the mails, to offer to sell or to sell securities, or carried or caused to be carried through the mails or in interstate commerce, by means or instruments of transportation, securities for the purpose of sale or for delivery after sale, when no registration statement had been filed or was in effect as to such securities, and when no exemption from registration was applicable.

141.   By engaging in the conduct described above, the defendants violated, and unless restrained and enjoined, will continue to violate, Section 5(a) and (c) of the Securities Act, 15 U.S.C. §§ 77e.

## SECOND CLAIM FOR RELIEF

### Fraud in the Offer or Sale of Securities
### Violations of Section 17(a) of the Securities Act
### (against all Defendants)

142.   The SEC realleges and incorporates by reference paragraphs 1 through 131 above.

143.   The defendants, and each of them, by engaging in the conduct described above, directly or indirectly, in the offer or sale of securities by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails:

a) with scienter, employed devices, schemes, or artifices to defraud;

b) obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

c) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

144.   By engaging in the conduct described above, the defendants violated, and

unless restrained and enjoined, will continue to violate, Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

## THIRD CLAIM FOR RELIEF

**Fraud in Connection with the Purchase or Sale of Securities**

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5**

**(against all Defendants)**

145.   The SEC realleges and incorporates by reference paragraphs 1 through 131 above.

146.   The defendants, by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities or interstate commerce, of the mails, or of the facilities of a national securities exchange, with scienter:

  a) employed devices, schemes, or artifices to defraud;

  b) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

  c) engaged in acts, practices or courses of business which operated or would operate as a fraud or deceit upon other persons.

147.   By engaging in the conduct described above, the defendants violated, and unless restrained and enjoined, will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

## FOURTH CLAIM FOR RELIEF

**Violation of Section 15(a) of the Exchange Act**

**(against Defendant Catipay)**

148.   The SEC realleges and incorporates by reference paragraphs 1 through 131 above.

149.   Defendant Catipay has, by engaging in the conduct set forth above, made use of the mails and means or insturmentalities of interstate commerce to effect

25

transactions in, and induced and attempted to induce the purchase or sale of, securities (other than exempted securities or commercial paper, bankers' acceptances, or commercial bills) without being registered with the SEC in accordance with Section 15 of the Exchange Act, § 78o, and without complying with any exemptions promulgated pursuant to Section 15(a)(2), 15 U.S.C. § 78o(a)(2).

150.   By reason of the foregoing, Defendant Catipay, has directly and indirectly, violated, and unless enjoined will continue to violate, Section 15(a)(1) of the Exchange Act, 15 U.S.C.§ 78o(a)(1).

## PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court:

### I.

Issue findings of fact and conclusions of law that defendants committed the alleged violations.

### II.

Issue orders, in a form consistent with Fed. R. Civ. P. 65(d), (1) preliminarily enjoining defendants Prometheus and Catipay; (2) permanently enjoining all defendants, and their agents, servants, employees, and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 5(a) and (c) and Section 17(a) of the Securities Act, 15 U.S.C. §§ 77e(a), 77e(c), and 77q(a) and Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. §§ 240.10b-5; and (3) permanently enjoining defendant Catipay, and his agents, servants, employees, and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 15(a)(1) of the Exchange Act, 15 U.S.C.§ 78o(a)(1).

### III.

Issue, in a form consistent with Fed. R. Civ. P. 65, an order freezing the assets

of all defendants; expediting discovery; prohibiting each of the defendants from destroying documents; ordering an accounting by all defendants; and appointing a receiver over defendants Prometheus.

### IV.

Order defendants to disgorge all ill-gotten gains from their illegal conduct, together with prejudgment interest thereon.

### V.

Order defendants to pay civil penalties under Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d) and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3) .

### VI.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

### VII.

Grant such other and further relief as this Court may determine to be just and necessary.

Dated:  April 14, 2016                          Respectfully submitted,


                                                 */s/ Amy Jane Longo*
                                                 Amy Jane Longo
                                                 David M. Rosen
                                                 Attorneys for Plaintiff
                                                 Securities and Exchange Commission