Thomas W. McNamara
info@regulatoryresolutions.com
Regulatory Resolutions
501 West Broadway, Suite 2020
San Diego, California 92101
Telephone: 619-269-0400
Facsimile: 619-269-0401

*Court-Appointed Receiver*

Daniel M. Benjamin (SBN 209240)
dbenjamin@mcnamarallp.com
Andrew W. Robertson (SBN 62541)
arobertson@mcnamarallp.com
Edward Chang (SBN 268204)
echang@mcnamarallp.com
McNamara Benjamin LLP
501 West Broadway, Suite 2020
San Diego, California 92101
Telephone: 619-269-0400
Facsimile: 619-269-0401

*Attorneys for Receiver*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>    Plaintiff,<br><br>    v.<br><br>PLCMGMT LLC, dba PROMETHEUS LAW, JAMES A. CATIPAY, and DAVID A. ALDRICH,<br><br>    Defendants. | Case No. 2:16-cv-02594-TJH (FFMx)<br><br>**RECEIVER'S STATUS REPORT AND ACCOUNTING**<br><br>Judge:   Hon. Terry J. Hatter, Jr.<br>Ctrm.:   17 |

# TABLE OF CONTENTS

Page

I. INTRODUCTION ...........................................................................................................1

II. RECEIVERSHIP ACTIVITIES ....................................................................................2
    A.    Defendants' Site .........................................................................................2
    B.    Bank Accounts ...........................................................................................2
    C.    Documents and Electronic Data.................................................................3
    D.    Cooperation of Individual Defendants.......................................................3

III. THE UNIVERSE OF INVESTORS..............................................................................5

IV. FINANCIAL INFORMATION .....................................................................................7
    A.    Prometheus Financial Summary ................................................................7
    B.    Receivership Accounting to Date ..............................................................9

V. THE PROSPECTS FOR RECOVERY ........................................................................9
    A.    Business and Personal Assets ....................................................................9
        1.    Prometheus......................................................................................9
        2.    Catipay............................................................................................9
        3.    Aldrich ..........................................................................................11
    B.    Clawback Claims .....................................................................................11
    C.    Case Portfolio...........................................................................................12
    D.    Claims Against Third Parties ...................................................................15

# RECEIVER'S STATUS REPORT AND ACCOUNTING

## I.

## INTRODUCTION

I was appointed Receiver of Defendant PLCMGMT LLC, dba Prometheus Law ("Prometheus") by the Court's Preliminary Injunction entered April 26, 2016 (ECF No. 20). I submit this Status Report and Accounting to provide the Court an update on receivership activities, the financial condition of Prometheus and its affiliates, and the prospects for recovery by the defrauded investors of Prometheus.

Prometheus was incorporated in California with ownership initially shared by Defendants James Catipay ("Catipay") (55%) and David Aldrich ("Aldrich") (45%), but by February 2015 it was owned 100% by Catipay. This receivership does not extend to the Washington state entity with an identical name (PLCMGMT, LLC) formed and owned entirely by Aldrich. For clarity, we will adopt here the nomenclature of the SEC's Complaint – Prometheus is the named Defendant subject to the receivership; PLC-WA is the Aldrich entity which is not a Defendant nor subject to the receivership, although Aldrich received and disbursed Prometheus funds through accounts in the name of PLC-WA.

As the Court is aware, the SEC's underlying case is nearly concluded. Prometheus principals Catipay and Aldrich have both consented to the entry of formal Judgments of liability which were entered on May 27, 2016 (Catipay, ECF No. 42) and September 15, 2016 (Aldrich, ECF No. 70). The Judgments include permanent injunctions against any future violations of the Securities Exchange Act of 1934 or the Securities Act of 1933 and order that each pay disgorgement of all ill-gotten gains and a civil penalty with the amounts to be determined by the Court upon a future motion to be brought by the SEC.

///
///
///

1    LACV16-01048 ODW (JPRx)
RECEIVER'S STATUS REPORT AND ACCOUNTING

## II.
## RECEIVERSHIP ACTIVITIES

### A. Defendants' Site

As directed and authorized by Section VIII(A) of the Preliminary Injunction, we took possession of the Prometheus office at 1130 S. Flower Street, #401, Los Angeles, California on April 27, 2016. The office is a work loft condominium of approximately 2,118 square feet, which has been configured to have one bedroom and an office environment comprised of six work stations with computers and telephones. No active operations were taking place, but we did find current business and financial records on site. One feature of this site that stood out was the presence of a very large recently-purchased 1,000 pound safe housed on the second floor – upon our arrival, that safe was open, unlocked, and empty.

Initial access was provided and coordinated by Catipay's then counsel, Tim Umbreit, and former Prometheus "funding manager," Michael Ewans. The premises were secured and a locksmith changed the locks. Mr. Ewans has since made himself readily available to the receivership team to respond to inquiries regarding Prometheus operations.

### B. Bank Accounts

In response to the Preliminary Injunction Asset Freeze, the following accounts have been frozen:

| Account Name | Bank | Account No. | Balance Frozen |
|---|---|---|---|
| PLCMGMT LLC (CA) | Wells Fargo | 4489 | $25.08 |
| PLCMGMT LLC (CA) | Wells Fargo | 9686 | $62.59 |
| James Catipay | JPMC | 1931 | $24.18 |
| James Catipay | JPMC | 5529 | $450.00 |
| James Catipay | JPMC | 9071 | $26.98 |
| James Catipay | Wells Fargo | 5245 | $13.14 |
| James Catipay dba James Catipay | Wells Fargo | 2133 | $6.46 |

| Account Name | Bank | Account No. | Balance Frozen |
|---|---|---|---|
| James Catipay | Wells Fargo | 8065 | $37.00 |
| Law Office of James Catipay | Wells Fargo | 3531 | $16.00 |
| Law Office of James Catipay | Wells Fargo | 8115 | $15.96 |
| David Aldrich / UFundLeads LLC | JPMC | 9163 | $32,830.83 |
| David Aldrich / UFundLeads LLC | JPMC | 8625 | $4.34 |
| David Aldrich | Wells Fargo | 9431 | $180.76 |
| Anna Aldrich | Washington Federal Bank | 7558 | $101.53 |
| **Total** | | | **$33,794.85** |

In addition to the funds in these accounts, Prometheus and Catipay have additional assets as described below.

### C. Documents and Electronic Data

Upon taking possession of the premises, we confirmed that all hard copy documents on site were secure. A computer forensic team retained by the Receiver made images of all computers onsite. After the imaging process was completed, the computers and most of the hard copy documents were moved to the Receiver's office in San Diego. We commenced the review of this information in order to reconstruct the operational and financial picture and identify assets and/or claims against third parties.

### D. Cooperation of Individual Defendants

At the outset, Mr. Catipay was overtly uncooperative and refused to communicate with me or my attorneys, except through intermediaries. When he finally made himself available by telephone, he either lied or deflected throughout our conversations. I found him to have zero credibility on any subject. For example, during a telephone call with me and my counsel on May 17, 2016, Catipay displayed his full range of deception:

- When asked how the balance in his Chase savings account decreased from $70,000 on April 16, 2016 to $25,000 when he filed his financial disclosures statement on May 10, 2016, he said he "blew through" the money and had nothing to show for it, except that he did have cash on hand of $7,800. In response to our demand, he later sent that cash by FedEx to the receivership.
- When asked generally where the investor money went, he said he spent $1.8 million for what he termed "personal uses" (i.e., tuition, American Express bills, money to Beverly Palacio, redemptions, commissions, and attorneys' fees). He later stated that he spent a little over $1 million in cash over a one-year period – his practice was to go to the bank, write checks for cash and spend the cash – no large purchases, but he said he spent $2,000-3,000 per day on female escorts.
- Regarding his luxury Nissan GT-R vehicle, he admitted that he lied about it in a previous call and that Prometheus money funded its purchase – title was in the name of Beverly Palacio. Upon demand, he also turned that car over to the receivership.
- When asked if he had ever owned a Lamborghini, he said, no, and explained that a photo with him in a Lamborghini was just him in a car that he washed as part of his job as an exotic car washer and detailer. This is expressly contradicted by DMV records and his own insurance records that he previously owned two Lamborghinis.
- When asked about $2,500 monthly car payments to an apparent girlfriend, he denied making such payments, but the girlfriend confirmed that he did. She also confirmed that he used her name and good credit to buy a Fisker luxury car.

///

- When asked about a series of $10,000 wire transfers to China Construction Bank, Catipay said he was just sending that money to his girlfriend's mother in China after she gave him the $10,000 in cash. The girlfriend later confirmed to us that these wires were payments by Catipay to help her pay a familial loan she secured to buy a condominium in Monterey Park, California.

We have grave concerns that Catipay has significant amounts of cash in his possession, as the explanations he offered about how he "blew" the money were preposterous.

We have not spoken directly with Aldrich, who appears to have had no involvement or relationship with Prometheus since February 2015. His counsel has been generally cooperative and has assisted in securing answers to our questions.

## III.

## THE UNIVERSE OF INVESTORS

Our review of Prometheus' records has generally confirmed the narrative set out in the SEC's Complaint and evidence submitted in support of the Preliminary Injunction. Given that Judgments have been entered as to both principals, we need not revisit the details of the securities law violations alleged by the SEC except as context for the receivership's pursuit of assets and the identification of investors.

The business "model" at the core of the Prometheus business has been well documented and has been confirmed by our review of the materials onsite. In a nutshell, Prometheus' mission, denominated "Legal Marketing," was to locate and pre-qualify potential plaintiffs for mass tort cases against drug manufacturers and then refer them to contingency fee counsel in return for a share of their contingency fee. In its various iterations, this business embraced unlawful fee splitting, fraud, and the sale of unregistered securities. As implemented, it also

///

embraced the outright theft of more than $5 million by Catipay and Aldrich who diverted at least that much in investors' funds for their personal use.

The Catipay Law Firm and Prometheus entered into joint representation and fee share agreements with the law firm Paglialunga & Harris ("P&H") whereby Catipay/Prometheus supposedly managed the marketing and initial evaluation of potential plaintiffs.  P&H, in turn, would litigate the cases pursuant to retainer agreements with qualified plaintiffs and then share 1/3 of its Net Fees with Catipay/Prometheus.

To fund this search for potential plaintiffs, Prometheus went to market with an "offering" riddled with red flags – "prepaid forward contracts" with guaranteed returns of 100-300% that were to be secured by UCC-1 filings.  This offering was unlawful in structure (unregistered security) and implementation (sales pitch based on overt fraud).  Prometheus has never had any financial capacity to deliver on even the bare minimum of its promised returns.  As of the date of the Receiver's appointment, Prometheus had received no fee share payments and had cash assets in bank accounts totaling only $87.  And nearly 50% of the investor funds deposited to Prometheus were squandered by the principals.

Based on our review of internal Prometheus records[1], we have confirmed the rough universe of investors in Prometheus and have built a database with contact information as to each which can serve as the foundation for a future claims process.

We have identified 257 individual investors who placed $10.8 million with Prometheus, plus $1,190,000 invested by Prometheus Capital Partners ("PCP"), an investment partnership based in Denver, Colorado, for a total of $12,034,169.  Prometheus was not provided the details as to the sources of PCP's investment so we do not have individual investor names underlying the PCP investment.

---

[1] We should note that Prometheus did maintain a detailed running schedule of investors which has proven to be reasonably reliable.

In general, as funds were received, Prometheus internally allocated them into $10,000 increments (a limited number were $5,000 or $7,500), theoretically assigned to a potential plaintiff. There was, however, no effort to actually formalize any form of security interest against a specific potential plaintiff. Potential plaintiffs were just that – "potential" – as most were not the subject of an actual filed cases and all or some of them could fall off the roster as unqualified based on further due diligence.

After subtracting redemptions from seven investors who received their funds back ($170,000) and returns paid to six investors ($136,000), current aggregate losses are calculated at $11.7 million. Based on Prometheus' internal records, it appears that approximately 117 investors funded their investments in whole or in part from IRA accounts, at least as indicated by Prometheus' internal records.

For details as to the inflow of investor funds and how Defendants spent/squandered those funds, see the Financial Information section below.

## IV.
## FINANCIAL INFORMATION

### A. Prometheus Financial Summary

The receivership retained Thad Meyer of Alliance Turnaround Management to prepare a forensic reconstruction of Prometheus' finances. His detailed report is submitted as Exhibit A to this Status Report. The essential findings of that report can be summarized as follows:

- The first $5.84 million of investor funds to Prometheus were deposited (September 2013 through October 2014) into Aldrich-controlled accounts in the name of PLC-WA. Aldrich disbursed those funds for various purposes, including transfers to Prometheus accounts controlled by Catipay from which Catipay paid commissions.

///

- In October 2014, Aldrich and Catipay switched roles – investor funds were thereafter deposited to Catipay-controlled Prometheus accounts from which Catipay disbursed funds, including commissions and transfers to PLC-WA. Investor funds from individuals deposited to Catipay's control totaled $5.17 million, plus an additional $1,190,000 from PCP.

- By February 2015, Aldrich and Catipay had parted ways and Catipay proceeded with Prometheus as the sole owner.[2] Aldrich brought in $1.39 million new funds into PLC-WA, but those funds are outside the scope of this receivership over Prometheus.

- Aldrich disbursed funds from the PLC-WA account for his personal use to purchase an office condominium in Los Angeles ($1,072,103), pay his 2014 personal federal income taxes based on an inflated income number ($1,032,497), and in personal draws ($1,445,407).

- Catipay disbursed Prometheus funds to, or for the benefit of, Beverly Palacio, who is described by Catipay as his ex-wife, although our observations indicated she is still a close personal and business partner ($882,819), Herbalcure, a medical marijuana business in which he had some form of ownership ($821,828), and an apparent girlfriend ($303,919). He has also received $1,402,642 in personal draws.

- Through April 2016, Prometheus had not received a single dollar in fee share payments.

///

---

[2] The details of this split are described in lawsuits brought by Catipay in March 2015 in Los Angeles County Superior Court against Aldrich and others seeking dissolution of the partnership and other remedies. *See Catipay v. Aldrich*, Case No. BC574522. Prometheus and Catipay are involved in at least three other lawsuits in Los Angeles County Superior Court. *See PLCMGMT LLC v. EON Escrow, Inc.*, Case No. BC593807; *Catipay v. Prometheus Capital Partners, LLC*, Case No. BC605665; *Detamore v. Wheeler*, Case No. BC622437.

### B. Receivership Accounting to Date

The receivership bank account currently has a cash balance of $409,145. Attached as Exhibit B is the SEC Standardized Fund Accounting Report for the receivership period from appointment on April 26, 2016 through November 8, 2016. That report indicates receipts of $421,671, disbursements of $4,166, and net cash of $417,505.

## V.

## THE PROSPECTS FOR RECOVERY

The primary business of this receivership is to cost-effectively accumulate the available assets of Prometheus which may include assets in the hands of others, including Catipay and Aldrich, acquired with Prometheus funds. All collected funds will be accumulated for ultimate return to investors. We report our progress to date below. As noted below, the most promising "asset" is the potential fee sharing revenue from the P&H Case Portfolio, although we have no realistic basis to project the amount of those revenues.

### A. Business and Personal Assets

#### 1. Prometheus

At the time of our appointment, Prometheus had cash funds in the bank of only $87. We have not identified any other assets, real or personal, held in the name of Prometheus.

#### 2. Catipay

Catipay had less than $1,000 in his personal accounts and no other identified real or personal property. Yet, the forensic reconstruction described in Section II(B) identifies $1.4 million in "draws" to Catipay and $1.8 million in Catipay-directed cash disbursements to third parties. When asked where the money went, Catipay cavalierly told the Receiver he just "blew it." We have made some progress in collecting a small portion ($262,000) of this missing or diverted cash, including:

- $7,800 cash recovered from James Catipay.
- $2,150 cash recovered from Beverly Palacio (Catipay's ex-wife).
- $114,068.90 from the sale of high-end vehicles registered to Beverly Palacio (Toyota FJ Cruiser, Nissan GT-R, and Ferrari).
- $100,000 from the "sale" of LA Auto, LLC, an auto repair business in which Beverly Palacio acquired with Prometheus funds.[3]
- $1,961 from the sale of three loaner vehicles owned by LA Auto.
- $1,126 cash from the accounts of LA Auto.

Given a long history of cash transactions, we suspect Catipay may have substantial cash secreted away, but we have not located it. We will seek to take his deposition testimony under oath as soon as possible, but to date, his counsel has indicated Catipay would invoke the Fifth Amendment. Catipay recently entered a criminal plea in federal court in San Diego and we are presently seeking his deposition now that his plea has been entered. We continue to review the viability of claims against Beverly Palacio, Herbalcure, and Catipay's former girlfriend for the return of funds they received from Catipay that were traceable to Prometheus.

While the Flower Street condominium bought with $1,072,103 of Prometheus funds was originally titled to PLC-WA, it is now titled to James Catipay following a settlement between Aldrich and Catipay by which Aldrich agreed to quitclaim the property to Catipay. Prior to providing the quitclaim, however, Aldrich consented to the recording of a Deed of Trust on the property for $2.975 million as security for PCP's investment in Prometheus. In our view, that Deed of Trust is voidable as a fraudulent transfer and we will seek to have it removed and sell the condominium with the net proceeds to the receivership.

---

[3] After confirming that Beverly Palacio had acquired an auto repair business in central Los Angeles (LA Auto) with Prometheus money and was about to complete a deal for $100,000 to effectively sell the business via return of the lease to the landlord, we secured an Order from the Court on June 28, 2016 (ECF No. 52) that LA Auto was a receivership asset and later secured the $100,000.

### 3. Aldrich

We have made some progress in recovering Prometheus funds disbursed to Aldrich or to third parties for his personal benefit.

Aldrich deployed $1,032,497 of Prometheus investor funds in March 2015 to pay his own personal federal income taxes based on a 2014 return that inflated his income by categorizing investor funds as income to him. This appears to have been a maneuver to park funds with the U.S. government, subject to return via a later amended tax return. Aldrich has now cooperated in the preparation and filing of an amended federal tax return for 2014 seeking refunds of portions of those taxes.

While the state of Washington does not have a personal income tax, PLC-WA used Prometheus funds to pay substantial corporate excise taxes based on the same inflated income. We are now working with Aldrich and his counsel to pursue the possible recovery of those taxes.

Aldrich also used Prometheus funds to pay a $50,000 retainer to his counsel. A small portion of that retainer related to pre-receivership services. Counsel have agreed to freeze the remaining $47,123 in his client trust account.

We have also identified real property in the Seattle area which are titled in the name of Aldrich's wife who asserts that they are her separate property. We are further investigating if funds traceable to Prometheus were involved in the purchase or maintenance of those properties.

### B. Clawback Claims

It is textbook law that a Receiver may "clawback" profits and commissions and add them to the pool of funds for later distribution to investors who lost money. *See*, for example: *Donell v. Kowell*, 533 F.3d 762, 779 (9th Cir. 2008) and *Hays v. Adam*, 512 F. Supp. 2d 1330, 1344 (N.D. Ga. 2007).

Only six investors received any sort of return from Prometheus and only one of those was an overall winner with a net profit of $2,500. The other five had

"profits" on individual contracts of $10,000 each, but in the aggregate, their Prometheus investments were net losses. The one overall winner has already returned his $2,500 profit to the receivership.

We have identified 37 sales consultants who received commissions totaling approximately $1.1 million, plus PCP which was paid a commission of $119,000 on its investment of $1,190,000. We have formally submitted our demand to each that they return to the receivership all commissions paid to them. The initial reaction to our demand letters has been positive with most indicating a desire to resolve without litigation. If we are unable to resolve amicably, we will initiate formal litigation.

Three of the 37 targets received commissions exceeding $100,000 ($320,250, $240,864, and $119,000, respectively), three others received between $50,000 and $100,000. We have not discerned any specific commission structure except that most were in the 5-10% range, but the largest commission recipient was paid an exorbitant 15% on some investors. 26 of the 37 were recruited in some capacity by one individual who received an override of 5-6% on all investors they delivered to Prometheus.

### C. Case Portfolio

Subject to multiple qualifiers, described below, the Case Portfolio being administered by P&H does represent a valuable asset to the receivership as the fee share due to the receivership could be substantial.

We have met with the attorney from P&H on several occasions and have reviewed summaries of the Case Portfolio. Based on that review, we can provide a general summary of the Portfolio. The Portfolio is composed of approximately 2,115 potential cases. This number may fluctuate because potential plaintiffs may be dropped if further due diligence indicates that they are not qualified or their injuries are not provable. It must be stressed that 2,115 is the number of potential plaintiffs pre-screened by counsel to date – it is not the number of cases that have

been filed.  At present, approximately 837 actual cases have been filed.  We are told this is common in mass tort litigation where cases do not have to be filed until there is an imminent statute of limitations issue.  As favorable results are reached in trials or settlements in the filed cases, counsel for the plaintiffs will work toward a global settlement involving all other plaintiffs with provable injuries.

Ninety-five percent of the Portfolio are potential cases relating to Risperdal, an anti-psychotic medicine manufactured by a subsidiary of Johnson & Johnson. The potential plaintiffs (2,024) are all men alleged to have suffered the side effect of gynecomastia (male breast enhancement).  824 actual cases have been filed in Los Angeles County Superior Court and have been consolidated before one judge who has also been assigned thousands of other Risperdal cases brought by unrelated counsel and parties.  The judge has identified "bellwether" cases and instructed counsel to work these up for trial.  These cases represent categories of plaintiffs based on age, the years in which the drug was used, and the applicable warning label used during those years.  Settlements or trial results in these cases will present valuation parameters for other cases.  There have been verdicts and settlements in Risperdal cases in other jurisdictions, but they cannot be extrapolated to value our cases, especially without knowing all the factual details of the claims.

The remaining cases involve an assortment of drugs.  Actos, a diabetes drug (29 cases, four of which have been filed and seven of which have settled for $1.76 million); Transvaginal Mesh (commonly called "TVM") a surgical implant for women suffering from incontinence or organ prolapse (four cases have been filed, but none have yet been resolved); Nuvaring, a female contraception product (four cases, all of which have been settled); SSRI prescription anti-depressants (18 cases, none filed); Tylenol (1 potential plaintiff); Testosterone (2 potential plaintiffs); and Topamax (1 potential plaintiff).

1  Lead counsel for the cases in the Case Portfolio has emphasized that it is
2 impossible to project with any accuracy the "value" of the Portfolio or the fees that
3 may flow from the cases before they are tried or resolved. Litigation is inherently
4 unpredictable and very fact and court specific. Beyond the lack of precision, it is
5 also not strategically wise for counsel to provide public estimates of valuation
6 which could adversely impact future trials or settlement negotiations. The high
7 concentration of the Case Portfolio on Risperdal cases creates a possibility for
8 dramatic swings in the overall value of the Case Portfolio (positive or negative) as
9 the Risperdal bellwether cases are tried or settled.
10  We have posted a summary of the Portfolio on the Receiver's website and
11 we have cautioned investors that they should resist the temptation to embrace press
12 or anecdotal reports about litigation results in other cases involving the same drugs.
13 Damage awards by juries are not precedents for future cases involving the same
14 drug; instead, they offer only the most general guidance. Each case will depend on
15 its specific facts – the age of the plaintiff; the severity of the side effects; the
16 provability of the side effects; the plaintiff's knowledge of the risks; the warning
17 label used on the product, the forum in which the case is filed; and many other
18 factors. In some settlements, the manufacturer may simply allocate a total dollar
19 amount for settlement which must then be divided among the plaintiffs (filed and
20 unfiled) as determined by third party mediators.
21  If the cases are resolved in favor of the plaintiffs, the fees due the
22 receivership will be one-third (1/3) of the fees lead counsel receives, which is
23 generally 40% of the net recovery subject to other reductions: The fees paid to the
24 receivership will be accumulated by the receivership and ultimately disbursed to
25 investors, net of court-approved expenses, after court approval.
26  On September 2, 2016, Catipay assigned all his rights in the Joint
27 Representation Agreement with P&H to the Receiver. To date, the receivership
28 ///

has received payments totaling $151,251.34 from P&H, representing the receivership's share of fees from settlements in 13 cases to date.

### D. Claims Against Third Parties

We are evaluating the viability of potential claims against third party professional service providers.

Dated: November 10, 2016

By: S/ Thomas W. McNamara
Thomas W. McNamara
Receiver

# **CERTIFICATE OF SERVICE**

I hereby certify that on November 10, 2016, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of the filing to all participants in the case who are registered CM/ECF users.

I further certify that I have caused the foregoing to be mailed by First Class Mail, postage paid, to the following non-CM/ECF participants:

>Beverly Yadao Palacio
>1130 South Flower, Suite 310
>Los Angeles CA 90015

                                                       S/ Andrew W. Robertson
                                                    Andrew W. Robertson